## COOK COUNTY, ILLINOIS *v.* UNITED STATES
### EX REL. CHANDLER

No. 01–1572.   Argued January 14, 2003—Decided March 10, 2003

120

SOUTER, J., delivered the opinion for a unanimous Court.

*Donna M. Lach* argued the cause for petitioner. With her on the briefs were *Richard A. Devine, Patrick T. Driscoll, Jr., Sanjay T. Tailor, Jerold S. Solovy,* and *Barry Sullivan.*

*Judson H. Miner* argued the cause for respondent. With him on the brief were *George F. Galland, Jr.,* and *Charlotte Crane.*

*Malcolm L. Stewart* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Olson, Assistant Attorney General McCallum, Deputy Solicitor General Clement, Douglas N. Letter,* and *Michael E. Robinson.**

---

*Briefs of *amici curiae* urging reversal were filed for the City of New York et al. by *Michael A. Cardozo, Leonard J. Koerner, Gail Rubin, Merita A. Hopkins, A. Scott Chinn,* and *Grant F. Langley;* for the County of Orange, California, et al. by *Walter Dellinger, Jonathan D. Hacker,* and *James R. Asperger;* for 43 Local Governmental Airport Proprietors by *Scott P. Lewis;* for the National Association of Counties et al. by *Richard Ruda, Robert K. Huffman, Miriam R. Nemetz, Charles A. Rothfeld,* and *Robert L. Bronston;* for the National Association of Public Hospitals and

JUSTICE SOUTER delivered the opinion of the Court.

In *Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U. S. 765 (2000), we held that States are not "persons" subject to *qui tam* actions under the False Claims Act (FCA), 31 U. S. C. §§ 3729–3733. Here, the question is whether local governments are amenable to such suits, and we hold that they are.

I

*Stevens, supra,* at 768–770, explains in some detail how the FCA currently provides for civil penalties against "[a]ny person" who (so far as it concerns us here) "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." § 3729(a)(1). Although the Attorney General may sue under the FCA, so may a private person, known as a relator, in a *qui tam* action brought "in the name of the Government," but with the hope of sharing in any recovery. § 3730(b). The relator must inform the Department of Justice of her intentions and keep the pleadings under seal for 60 days while the Government decides whether to intervene and do its own litigating. § 3730(b)(2); see also § 3730(c). If the claim succeeds, the defendant is liable to the Government for a civil penalty between $5,000 and $10,000 for each violation, treble damages (reducible to double damages for cooperative defendants), and costs.

Health Systems et al. by *Charles Luband;* and by the Texas Association of School Boards Legal Assistance Fund et al. by *William J. Boyce* and *Warren S. Huang.*

Briefs of *amici curiae* urging affirmance were filed for K & R Limited Partnership et al. by *Carl A. S. Coan III* and *Regina D. Poserina;* and for Taxpayers Against Fraud, the False Claims Act Legal Center, by *Charles J. Cooper, Brian Stuart Koukoutchos,* and *James Moorman.*

*Michael P. Dignazio* and *Francis X. Crowley* filed a brief as *amicus curiae* for the County of Delaware, Pennsylvania.

§ 3729(a).[1]  The relator's share of the "proceeds of the action or settlement" may be up to 30 percent, depending on whether the Government intervened and, if so, how much the relator contributed to the prosecution of the claim. § 3730(d).[2]  The relator may also get reasonable expenses, costs, and attorney's fees.  *Ibid.*

The fraud in this case allegedly occurred in administering a $5 million grant from the National Institute of Drug Abuse to Cook County Hospital, owned and operated as the name implies, with the object of studying a treatment regimen for pregnant drug addicts.  The grant was subject to a variety of conditions, including the terms of a compliance plan meant to assure that the study would jibe with federal regulations for research on human subjects.  Administration of the study was later transferred to the Hektoen Institute for Medical Research, a nonprofit research organization affiliated with the hospital.  Respondent, Dr. Janet Chandler, ran the study from September 1993 until the institute fired her in January 1995.

---

[1] The statutory penalties are adjusted upward for inflation under the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101–410, § 5, 104 Stat. 891, note following 28 U. S. C. § 2461.  The penalty is currently $5,500 to $11,000.  28 CFR § 85.3(a)(9) (2002).

[2] If the Government does not intervene, the relator is entitled to 25 to 30 percent of the proceeds.  31 U. S. C. § 3730(d)(2).  If the Government chooses to intervene, the relator "shall . . . receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action."  § 3730(d)(1).  If, however, the court determines that the action was "based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, the court may award such sums as it considers appropriate, but in no case more than 10 percent of the proceeds . . . ."  *Ibid.* (footnote omitted).

In 1997, Chandler filed this *qui tam* action, claiming that Cook County (hereinafter County) and the institute had submitted false statements to obtain grant funds in violation of § 3729(a)(1).[3] Chandler said that the defendants had violated the grant's express conditions, had failed to comply with the regulations on human-subject research, and had submitted false reports of what she called "ghost" research subjects. Chandler also alleged that she was fired for reporting the fraud to doctors at the hospital and to the granting agency, rendering her dismissal a violation of both state law and the whistle-blower provision of the FCA, § 3730(h).[4] The Government declined to intervene in the action.

The County moved to dismiss the claims against it, arguing, among other things, that it was not a "person" subject to liability under the FCA.[5] The District Court denied the motion, reading the term "person" in the FCA to include state and local governments. *United States ex rel. Chandler* v. *Hektoen Institute for Medical Research*, 35 F. Supp. 2d 1078 (ND Ill. 1999). The Court of Appeals dismissed the County's interlocutory appeal, and we denied certiorari. 528 U. S. 931 (1999). After *Stevens* came down, however, the District Court reconsidered the County's motion and dismissed Chandler's action. Although the court found "no reason to alter its conclusion that the County is a 'person' for purposes of the FCA," it held that the County, like a State, could not be subjected to treble damages, which *Stevens, supra*, at 784, described not as "remedial" but as "essentially punitive." 118 F. Supp. 2d 902, 903 (2000). The

---

[3] The hospital was originally a defendant as well but was dismissed from the case as having no identity independent of the County. 277 F. 3d 969, 971, n. 2 (CA7 2002).

[4] Chandler's retaliation claims against the County were dismissed because the institute, not the County, was her employer. *United States ex rel. Chandler* v. *Hektoen Institute for Medical Research*, 35 F. Supp. 2d 1078, 1087 (ND Ill. 1999).

[5] The institute also moved to dismiss, on different grounds; the denial of that motion is not before us. 277 F. 3d, at 969, n. 1.

Court of Appeals, in conflict with two other Circuits,[6] distinguished *Stevens* and reversed, 277 F. 3d 969 (CA7 2002). We granted certiorari, 536 U. S. 956 (2002), and now affirm the Court of Appeals.

## II

While § 3729 does not define the term "person," we have held that its meaning has remained unchanged since the original FCA was passed in 1863. *Stevens*, 529 U. S., at 783, n. 12. There is no doubt that the term then extended to corporations, the Court in 1826 having expressly recognized the presumption that the statutory term "person" " 'extends as well to persons politic and incorporate, as to natural persons whatsoever.' " *United States* v. *Amedy*, 11 Wheat. 392, 412 (1826) (quoting 2 E. Coke, The Second Part of the Institutes of the Laws of England 736 (1787 ed.) (reprinted in 5B 2d Historical Writings in Law and Jurisprudence (1986)); see 11 Wheat., at 412 ("That corporations are, in law, for civil purposes, deemed persons, is unquestionable"); accord, *Beaston* v. *Farmers' Bank of Del.*, 12 Pet. 102, 135 (1838); see also *Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518, 667 (1819) (opinion of Story, J.) (A corporation "is, in short, an artificial person, existing in contemplation of law, and endowed with certain powers and franchises which, though they must be exercised through the medium of its natural members, are yet considered as subsisting in the corporation itself, as distinctly as if it were a real personage"). This position accorded with the common understanding among contemporary commentators that corporations were "persons" in the general enjoyment of the capacity to sue and be sued. See, *e. g.*, 2 J. Bouvier, A Law Dictionary 332 (6th ed. 1856) (def. 2: The term "person" "is also used to denote a corporation which is an artificial person"); 1 S. Kyd, A Trea-

---

[6] *United States ex rel. Dunleavy* v. *County of Delaware*, 279 F. 3d 219 (CA3 2002); *United States ex rel. Garibaldi* v. *Orleans Parish School Bd.*, 244 F. 3d 486 (CA5 2001).

tise on the Law of Corporations 13 (1793) ("A CORPORATION then, or a body politic, or body incorporate, is a collection of many individuals, united into one body, . . . and vested, by the policy of the law, with the capacity of acting, in several respects, as an *individual*, particularly of taking and granting property, of contracting obligations, and of suing and being sued . . ."). While it is true that Chief Justice Marshall's opinion in *Bank of United States* v. *Deveaux*, 5 Cranch 61, 86–87 (1809), declined to rely on the presumption when it decided the separate issue whether a corporation was a "citizen" for purposes of federal diversity jurisdiction, by 1844 the *Deveaux* position had been abandoned and a corporation was understood to have citizenship independent of its constituent members by virtue of its status as "a person, although an artificial person." *Louisville, C. & C. R. Co.* v. *Letson*, 2 How. 497, 558 (1844); see 1 A. Burrill, A Law Dictionary and Glossary 383 (2d ed. 1859) ("A corporation has been declared to be not only a *person*, . . . but to be capable of being considered an *inhabitant* of a state, and even of being treated as a *citizen*, for all purposes of suing and being sued").

Essentially conceding that private corporations were taken to be persons when the FCA was passed in 1863, the County argues that municipal corporations were not so understood until six years later, when *Cowles* v. *Mercer County*, 7 Wall. 118 (1869), applied the *Letson* rule to them. *Cowles*, however, was not an extension of principle but a natural recognition of an understanding going back at least to Coke, *supra*, that municipal corporations and private ones were simply two species of "body politic and corporate," treated alike in terms of their legal status as persons capable of suing and being sued. See, *e. g.*, W. Glover, A Practical Treatise on the Law of Municipal Corporations 41 (1837) (Municipal corporations have, as an attribute "necessarily and inseparably incident to every corporation," the ability "[t]o sue or be sued, . . . and do all other acts as natural

persons may"); see also 1 J. Dillon, The Law of Municipal Corporations 92 (rev. 2d ed. 1873). Indeed, "[t]he archetypal American corporation of the eighteenth century [was] the municipality"; only in the early 19th century did private corporations become widespread. M. Horwitz, The Transformation of American Law, 1780–1860, p. 112 (1977). This history explains how the Court in *Cowles* could conclude "automatically and without discussion" that municipal corporations, like private ones, "should be treated as natural persons for virtually all purposes of constitutional and statutory analysis." *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 687–688 (1978); see *Cowles, supra,* at 121 (describing the question as one that "presents but little difficulty").[7]

Of course, the meaning of "person" recognized in *Cowles* is the usual one, but not immutable, see *Monell, supra,* at 688, and the County asks us to take a cue from the qualification included in the later definition in the Dictionary Act, Act of Feb. 25, 1871, § 2, 16 Stat. 431, that "the word 'person' may extend and be applied to bodies politic and corporate . . . unless the context shows that [it was] intended to be used in a more limited sense." Cf. J. Angell & S. Ames, A Treatise on the Law of Private Corporations Aggregate 4 (rev. 3d ed. 1846) ("The construction is, that when 'persons' are mentioned in a statute, corporations are included if they fall within the general reason and design of the statute"). The County invokes two points of context that it takes as

---

[7] The County and some of its supporting *amici* urge a further distinction between full-fledged municipal corporations such as towns and cities, which were incorporated at the request of their inhabitants, and *"quasi* corporations" such as counties, which were unilateral creations of the State. See *Barnes* v. *District of Columbia,* 91 U. S. 540, 552 (1876). While the liability of quasi corporations at common law may have differed from that of municipal corporations, see *ibid.,* both were treated equally as legal "persons." Indeed, *Cowles* itself applied to an Illinois county like Cook County.

indicating that in the FCA Congress intended a more limited meaning.

First, it says that the statutory text is "inherently inconsistent with local governmental liability," Brief for Petitioner 13, owing to the references of the original enactment to "any person in the land or naval forces of the United States" and "any person not in the military or naval forces of the United States," together with a provision imposing criminal liability, including imprisonment, on defendants in the latter category, see Act of Mar. 2, 1863, ch. 67, §§ 1, 3, 12 Stat. 696, 697, 698.[8] But the old text merely shows that "any person in the land or naval forces" was directed at natural persons. The second phrase, covering all other "persons," could not have been that limited, or even private corporations would be outside the FCA's coverage, a reading that not even the County espouses and one that we seriously doubted in *Stevens*, 529 U. S., at 782. As for the FCA's reference to criminal liability, "[t]he short answer is that it has not been regarded as anomalous to require compliance by municipalities with the substantive standards of . . . federal laws which impose [both civil and criminal] sanctions upon 'persons.'" *Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389, 400 (1978). Municipalities may not be susceptible to every statutory penalty, but that is no reason to exempt them from remedies that sensibly apply. *Id.*, at 400–401; *United States* v. *Union Supply Co.*, 215 U. S. 50, 54–55 (1909).

The other contextual evidence cited by the County is the history of the FCA. We recounted in *Stevens* that Congress's primary concern in 1863 was "'stopping the massive frauds perpetrated by large [private] contractors during the Civil War.'" 529 U. S., at 781 (quoting *United States* v. *Bornstein*, 423 U. S. 303, 309 (1976), but adding "[private]"). Local governments, the County says, were not players in the

---

[8] The FCA's civil and criminal provisions were bifurcated in 1878, see *Rainwater* v. *United States*, 356 U. S. 590, 592, n. 8 (1958), and the latter provisions have since been recodified at 18 U. S. C. § 287.

game of war profiteering that the FCA was meant to stop. Of course, this is true, but in no way does it affect the fact that Congress wrote expansively, meaning "to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States* v. *Neifert-White Co.*, 390 U. S. 228, 232 (1968). Whatever municipal corporations may have been doing in 1863, in 2003 local governments are commonly at the receiving end of all sorts of federal funding schemes and thus no less able than individuals or private corporations to impose on the federal fisc and exploit the exercise of the federal spending power. Cf. *Monell, supra*, at 685–686 (noting that municipalities can, "equally with natural persons, create the harms intended to be remedied [by 42 U. S. C. § 1983]"). In sum, neither history nor text points to exclusion of municipalities from the class of "persons" covered by the FCA in 1863.

## III

Nor is the application of this reading of the statute affected by the County's alternative position, based on the evolution of the FCA's provisions for relief. The County's argument leads off, at least, with a sound premise about the historical tension between municipal liability and damages imposed as punishment. Although it was well established in 1863 "that a municipality, like a private corporation, was to be treated as a natural person subject to suit for a wide range of tortious activity, . . . this understanding did not extend to the award of punitive or exemplary damages," *Newport* v. *Fact Concerts, Inc.*, 453 U. S. 247, 259–260 (1981). Since municipalities' common law resistance to punitive damages still obtains, "[t]he general rule today is that no punitive damages are allowed unless expressly authorized by statute." *Id.*, at 260, n. 21.

The County relies on this general statement in asking us to infer a remarkable consequence unstated in the 1986 amendments to the FCA. As part of an effort to modernize

the FCA, Congress then raised the fine from $2,000 to the current range of $5,000 to $10,000, and raised the ceiling on damages recoverable under § 3729(a) from double to treble. False Claims Amendments Act of 1986, Pub. L. 99–562, § 2(7), 100 Stat. 3153.   In *Stevens*, we spoke of this change as turning what had been a "remedial" provision into an "essentially punitive" one.   529 U. S., at 784, 785.   The County relies on this characterization to argue that, even if municipalities were covered by the term "person" from 1863 to 1986, Congress's adoption of a "punitive" remedy entailed the elimination of municipal liability in 1986.

Although we did indeed find the punitive character of the treble damages provision a reason not to read "person" to include a State, see *id.*, at 785, it does not follow that the punitive feature has the force to show congressional intent to repeal implicitly the existing definition of that word, which included municipalities.   To begin with it is important to realize that treble damages have a compensatory side, serving remedial purposes in addition to punitive objectives.   See, *e. g.*, *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 635–636 (1985) (citing *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477, 485–486 (1977)); *American Soc. of Mechanical Engineers, Inc.* v. *Hydrolevel Corp.*, 456 U. S. 556, 575 (1982); see also *Agency Holding Corp.* v. *Malley-Duff & Associates, Inc.*, 483 U. S. 143, 151 (1987).   While the tipping point between payback and punishment defies general formulation, being dependent on the workings of a particular statute and the course of particular litigation, the facts about the FCA show that the damages multiplier has compensatory traits along with the punitive.

There is no question that some liability beyond the amount of the fraud is usually "necessary to compensate the Government completely for the costs, delays, and inconveniences occasioned by fraudulent claims." *Bornstein, supra*, at 315; see *United States* v. *Halper*, 490 U. S. 435, 445 (1989) (noting that the Government's injury includes "not merely the

amount of the fraud itself, but also ancillary costs, such as the costs of detection and investigation, that routinely attend the Government's efforts to root out deceptive practices directed at the public purse"). The most obvious indication that the treble damages ceiling has a remedial place under this statute is its *qui tam* feature with its possibility of diverting as much as 30 percent of the Government's recovery to a private relator who began the action. In *qui tam* cases the rough difference between double and triple damages may well serve not to punish, but to quicken the self-interest of some private plaintiff who can spot violations and start litigating to compensate the Government, while benefiting himself as well. See *United States ex rel. Marcus* v. *Hess*, 317 U. S. 537, 547 (1943). The treble feature thus leaves the remaining double damages to provide elements of make-whole recovery beyond mere recoupment of the fraud. Cf. *Bornstein*, 423 U. S., at 315, and n. 11. It may also be necessary for full recovery even when there is no *qui tam* relator to be paid. The FCA has no separate provision for prejudgment interest, which is usually thought essential to compensation, see, *e. g., Kansas* v. *Colorado*, 533 U. S. 1, 10–11 (2001), and might well be substantial given the FCA's long statute of limitations, § 3731(b). Nor does the FCA expressly provide for the consequential damages that typically come with recovery for fraud, see Restatement (Second) of Torts § 549(1)(b), and Comment *d* (1976).[9]

Thus, although *Stevens* recognized that the FCA's treble damages remedy is still "punitive" in that recovery will exceed full compensation in a good many cases, the force of this

---

[9] The treble damages provision was, in a way, adopted by Congress as a substitute for consequential damages. The Senate version of the bill proposed consequential damages on top of treble damages, while the House version proposed consequential damages plus double damages. See S. Rep. No. 99–345, p. 39 (1986) (hereinafter S. Rep.); H. R. Rep. No. 99–660, p. 20 (1986). Ultimately, the Senate's treble figure was adopted and the consequential damages provision dropped.

punitive nature in arguing against municipal liability is not as robust as if it were a pure penalty in all cases. Treble damages certainly do not equate with classic punitive damages, which leave the jury with open-ended discretion over the amount and so raises two concerns specific to municipal defendants. One is that a local government's taxing power makes it an easy target for an unduly generous jury. See *Newport*, 453 U. S., at 270–271. But under the FCA, the jury is open to no such temptation; if it finds liability, its instruction is to return a verdict for actual damages, for which the court alone then determines any multiplier, just as the court alone sets any separate penalty. § 3729(a); see 277 F. 3d, at 978. There is mitigation, also, for the second worry, that "blameless or unknowing taxpayers" will be unfairly taxed for the wrongdoing of local officials. *Newport*, 453 U. S., at 267. This very case shows how FCA liability may expose only local taxpayers who have already enjoyed the indirect benefit of the fraud, to the extent that the federal money has already been passed along in lower taxes or expanded services. Cf. *ibid.* The question in such cases is whether the local taxpayer should make up for an undeserved benefit, or the federal taxpayer be permanently out of pocket, a question that can be answered in any given case, not by an opportunistic *qui tam* relator, but by a combination of the judge's discretion and the Government's power to intervene and dismiss or settle an action, see § 3730(c)(2).

The presumption against punitive damages thus brings only limited vigor to the County's aid. Working against the County's position, however, is a different presumption, this one at full strength: the "cardinal rule . . . that repeals by implication are not favored." *Posadas* v. *National City Bank*, 296 U. S. 497, 503 (1936). Inferring repeal from legislative silence is hazardous at best, and error seems overwhelmingly likely in the notion that the 1986 amendments wordlessly redefined "person" to exclude municipalities. The County's argument, it must be remembered, is not

merely that the treble damages feature of the 1986 amendments was meant to bypass municipal corporations; the argument is that the treble damages amendment must be read to eliminate the FCA's coverage of municipal corporations entirely, after being the statutory law for over a century. This would be a hard case to make in the abstract, but it is impossible when we consider what is known about the object of the amendments in 1986.

The basic purpose of the 1986 amendments was to make the FCA a "more useful tool against fraud in modern times." S. Rep., at 2. Because Congress was concerned about pervasive fraud in "all Government programs," *ibid.*, it allowed private parties to sue even based on information already in the Government's possession, see *Hughes Aircraft Co.* v. *United States ex rel. Schumer*, 520 U. S. 939, 946 (1997); increased the Government's measure of recovery; and enhanced the incentives for relators to bring suit. Yet the County urges that in so doing Congress made local governments, which today often administer or receive federal funds, immune not only from treble damages but from any liability whatsoever under the FCA. Congress could have done that, of course, but it makes no sense to suggest Congress did it under its breath.[10] It is simply not plausible that Congress intended to repeal municipal liability *sub silentio* by the very Act it passed to strengthen the Government's hand

---

[10] Indeed, there is some evidence that Congress affirmatively endorsed municipal liability when it passed the 1986 amendments. See S. Rep., at 8 (noting that "[t]he term 'person' is used in its broad sense to include partnerships, associations, and corporations ... as well as States and political subdivisions thereof" (citing, *inter alia, Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658 (1978))). Although in *Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U. S. 765 (2000), we considered this evidence insufficient to overcome the background presumption that States are not "persons," in the present case the statement belies the County's argument that Congress meant to change the contrary presumption applicable to local governments and to remove municipal liability.

in fighting false claims.   See *Burns* v. *United States,* 501 U. S. 129, 136 (1991).[11]

## IV

The term "person" in § 3729 included local governments in 1863 and nothing in the 1986 amendments redefined it.   The judgment of the Court of Appeals is

*Affirmed.*

---

[11] The presumption against implied repeal also explains why two of the County's subsidiary arguments cannot succeed here, despite the fact that we gave them credence in *Stevens.*   First, the County contrasts § 3729 with the Civil Investigative Demand provision enacted as part of the 1986 amendments, § 3733, which expressly includes both States and local governments in the definition of "person."   In *Stevens, supra,* at 783–784, we read that express reference in the later § 3733 to confirm the reading of the earlier § 3729, which was based on a common understanding in 1863 that "person" did not include a State; but "person" did presumptively include a municipality in 1863.

The County also argues it is not sensible to expose local governments to FCA liability but not to liability under the Program Fraud Civil Remedies Act of 1986 (PFCRA), Pub. L. 99–509, 100 Stat. 1934 (codified at 31 U. S. C. § 3801 *et seq.*), a statute enacted just before the FCA amendments and "designed to operate in tandem with the FCA." *Stevens, supra,* at 786, n. 17.   The PFCRA prohibits the same conduct as the FCA and specifically defines a "person" subject to liability as "any individual, partnership, corporation, association, or private organization." § 3801(a)(6). Even assuming the County is correct that local governments are not covered by the PFCRA despite the term "corporation," this is hardly a weighty argument for an implied repeal of municipal liability under the FCA, a separately enacted statute.