**UNITED STATES, ex rel. A. Amir ALI, under 31 U.S.C. Section 3729, Qui Tam Relator, Plaintiff–Appellant,**

v.

**DANIEL, MANN, JOHNSON & MENDENHALL, Defendants–Appellees.**

No. 02–56432.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 3, 2003.

Filed Jan. 20, 2004.

---

* Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

Brian M. Brown, Law Offices of Brian M. Brown, Tustin, CA, for the plaintiffs-appellants.

Kathryn E. White and David C. Scheper, Winston & Strawn, Los Angeles, CA, for the defendants-appellees.

Steve Frank, U.S. Department of Justice, Civil Division, Washington, DC, for the amicus.

Before: HUG, B. FLETCHER, and WARDLAW, Circuit Judges.

BETTY B. FLETCHER, Circuit Judge:

A. Amir Ali ("Ali") challenges the district court's grant of summary judgment in favor of Daniel, Mann, Johnson & Mendenhall ("DMJM") in this qui tam action under the False Claims Act ("FCA"). Ali alleges that DMJM, acting as a construction management firm for the California State University at Northridge ("CSUN"), knowingly submitted false claims to the Federal Emergency Management Agency

("FEMA"). The district court held that the corporation was not subject to liability under the FCA because DMJM was acting as an agent of the state when it allegedly submitted false claims. We have jurisdiction under 28 U.S.C. § 1291, and we reverse and remand.

## I. BACKGROUND

From February to September 1994, Ali was employed by CSUN as an architect coordinating the reconstruction of buildings damaged by the January 1994 Northridge earthquake.[1] CSUN retained DMJM as its construction management firm in December 1994, after CSUN terminated Ali's employment.

In January 1996, Ali filed a complaint in the Central District of California, alleging that CSUN and two CSUN officials filed false claims to FEMA for repairs not related to the Northridge earthquake. In May 2000, Ali amended the complaint to include allegations against DMJM. In June 2000, claims against CSUN and the CSUN officials were dismissed pursuant to the parties' joint stipulation. Therefore, the only remaining defendant is DMJM.

Ali alleges that he observed numerous FCA violations during his time at CSUN. Most importantly, as it relates to DMJM, Ali alleges that before the earthquake, the University Tower Apartments ("UTA") had been vacant for some time, and CSUN had no plans to reoccupy the building. Applicable FEMA regulations provided that buildings not in use at the time of the earthquake were ineligible for funding unless, prior to the disaster, the owner had an intent to reoccupy them within a reasonable time. 44 C.F.R. § 206.226(k)(2). In November 1993, the CSUN Foundation commissioned a study, dated December 15, 1993, by Coleman/Caskey Architects ("C/C Study") to determine the feasibility of reopening the UTA as student apartments.

On December 16, 1993, CSUN voted against acting on the proposals contained in the C/C Study. Ali alleges that DMJM employees knowingly submitted a fraudulent Memorandum and a Letter (collectively, "Communications") to FEMA claiming that the C/C Study clearly indicated CSUN's intent to reoccupy the building.

In January 2001, the district court denied DMJM's motion to dismiss on the basis of immunity under *Vermont Agency Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). On June 21, 2002, the district court granted summary judgment for DMJM, holding that the undisputed facts demonstrate that DMJM employees were acting as agents of CSUN, and thus DMJM is entitled to immunity for actions within the scope of their official duties. Appellant timely filed an appeal to this Court on August 15, 2002. *See* 28 U.S.C. § 2107(b).

## II. DISCUSSION

### A. *Standard of Review*

 The existence of sovereign immunity is a question of law reviewed de novo. *Porter v. Jones*, 319 F.3d 483, 489 (9th Cir.2003). The district court's grant of summary judgment is reviewed de novo. *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 461 (9th Cir.1999). We must determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *See* Fed R. Civ. P. 56(c); *Parsons Co.*, 195 F.3d at 461. We may affirm a grant of summary judgment on any ground supported by the record, even if not relied upon by the district court. *Simo v. Union of Needletrades*, 322 F.3d 602, 610 (9th Cir.2003).

---

1. Unless otherwise noted, the facts recounted here are not contested.

## B. *Immunity under the FCA*

The Supreme Court has held that states are not "persons" subject to qui tam liability under the FCA. *Stevens*, 529 U.S. at 780–88, 120 S.Ct. 1858. The *Stevens* Court did not reach the issue of sovereign immunity, construing the FCA to avoid that constitutional question. *Id.* at 787, 120 S.Ct. 1858. The Supreme Court did, however, rely on canons of statutory construction related to state sovereignty, such as (1) the presumption that the term "person" does not include the sovereign, *id.* at 780, 120 S.Ct. 1858; (2) the rule that Congress must clearly state its intention to subject states to liability, *id.* at 781–82, 787, 120 S.Ct. 1858; and (3) the presumption against imposition of punitive (treble) damages on governmental entities, *id.* at 784–85, 120 S.Ct. 1858. Relying on *Stevens*, we have held that "states and state agencies enjoy sovereign immunity from liability under the FCA." *Bly–Magee v. California*, 236 F.3d 1014, 1017 (9th Cir.2001) (citing *Stevens* without further analysis).

■ "Any person who," *inter alia*, "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval" can be held liable under the FCA. 31 U.S.C. § 3729(a). DMJM, a private corporation, is a "person" under the FCA. *See Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 123 S.Ct. 1239, 1244–49, 155 L.Ed.2d 247 (2003) (holding that municipal corporations, like other corporations, are "persons" under the FCA). Therefore, DMJM is subject to suit under the FCA unless it shares CSUN's sovereign immunity because of its relationship to CSUN. *See Bly–Magee*, 236 F.3d at 1017.

■ The district court held that the "DMJM employees Retamal and Duncan [who] allegedly violated the FCA" by writing the allegedly fraudulent Communications "were [acting] as agents and representatives of CSUN acting for the state within the scope of their official duties," and, therefore, DMJM is entitled to immunity for their actions. Thus, the district court treated the DMJM employees who allegedly undertook the fraudulent actions as if they were state employees and analyzed immunity as it applies to government officials.

The district court's analysis is in error. Ali sued DMJM, not individual DMJM employees Duncan and Retamal, who were working on the project. These employees were at no time employed by CSUN and were at all relevant times employed and paid by DMJM. Their on-site work managing the reconstruction of CSUN facilities under the supervision of CSUN officials does not transform Duncan and Retamal into government officials. Similarly, the fact that Ali's complaint states that DMJM was an agent of the University does not confer sovereign immunity on the corporation if it can be shown that the corporation or its employees knowingly submitted false claims to FEMA. Although the district court noted that there is "no evidence that DMJM employees acted for their own benefit," presumably DMJM received compensation for the $21 million reconstruction of UTA that it would not have received if FEMA had not funded the project. Although DMJM employees Duncan and Retamal were working on behalf of a state university, as employees of a private, for-profit contractor, they were not government officials for immunity purposes.[2]

---

**2.** DMJM could defeat the instant claims if it were to show that Duncan and Retamal had ceased to be agents of the corporation, such that their actions cannot be attributed to the

corporation, but such an outcome would not be premised on sovereign immunity. *See generally Corporation's Vicarious Liability for*

 The district court also relied on the independent contractor exception to federal government liability under the Federal Tort Claims Act ("FTCA") for torts committed by the federal government. The FTCA contains an explicit exception for contractors, such that the federal government is not liable for torts committed by its contractors. 28 U.S.C. §§ 1346(b), 2671. The courts use common law agency principles in tort to determine the scope of the "independent contractor exception" to the federal government's partial statutory waiver of sovereign immunity. *See Logue v. United States*, 412 U.S. 521, 526–27, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973). The district court concluded that Duncan and Retamal would not be considered independent contractors under the FTCA. The court reasoned that because the federal government could have been liable under the FTCA if CSUN were part of the federal government and Duncan or Retamal committed a tort, conversely, DMJM should receive sovereign immunity under the FCA for their actions.

Assuming arguendo that the DMJM employees assigned to CSUN would not be contractors under the FTCA, agency for tort liability has little bearing on sovereign immunity. The district court's analysis would lead to the surprising result that private corporate contractors acting on behalf of the state are immune from qui tam actions under the FCA, while local governments performing government functions are not. *See Chandler*, 538 U.S. at 119, 123 S.Ct. 1239. The test to determine whether an entity is entitled to sovereign immunity, described below, considers whether the entity performs government functions as one of five factors. *See, e.g.,*

*Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1044 (9th Cir.2003) ("In analyzing this factor, we assess the extent to which the state exercises centralized governmental control over the entity . . . ."). Thus, the extent of state control over the entity's work on behalf of the state is a factor, but is not necessarily determinative of sovereign immunity.

 DMJM argues that sovereign immunity may be extended to the corporation under *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940), and *Boyle v. United Techs. Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), even if DMJM does not meet the traditional test for sovereign immunity. The government contractor defense recognized in *Boyle* and *Yearsley* "protects a government contractor from liability for acts done by him while complying with government specifications during execution of performance of a contract with the United States." *McKay v. Rockwell Intern. Corp.*, 704 F.2d 444, 448 (9th Cir.1983); *see also Hercules Inc. v. United States*, 516 U.S. 417, 422, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (providing a similar definition, "if the contractor warned the United States about any hazards known to the contractor but not to the Government"). The contractor defense shields federal contractors from liability for actions that are tortious when done by private parties but not wrongful when done by the government, such as causing erosion on private land by building dikes for the government, *Yearsley*, 309 U.S. at 20–22, 60 S.Ct. 413;[3] building a helicopter to military specifications that might contain design defects if made for the general public, *Boyle*, 487

---

*Fraud of its Agent under False Claims Act,* 107 A.L.R. Fed. 665 (1992).

**3.** The *Yearsley* Court notes that the federal government provides compensation for taking

property, but private corporations cannot be held liable for physically carrying out the taking. 309 U.S. at 21, 60 S.Ct. 413.

U.S. at 505–10, 108 S.Ct. 2510; or trespassing onto land to build a highway, *Myers v. United States*, 323 F.2d 580 (9th Cir.1963). *Boyle* held that state tort law was preempted because of the federal interest in federal military contractors not being subjected to state tort suits. 487 U.S. at 505–12, 108 S.Ct. 2510 (holding that "state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a 'significant conflict' with federal policy and must be displaced"). However, the government contractor defense does not confer sovereign immunity on contractors. *Id.,* 487 U.S. at 505 n. 1, 108 S.Ct. 2510 (noting that the decision did not address immunity).

The federal interest in protecting its contractors from state tort liability is not implicated in suits alleging that state contractors submitted false claims to the federal government. Neither the Supreme Court nor the Ninth Circuit nor any other court of which we are aware has applied the defense to state contractors. Because the FCA requires that those held liable *knowingly* submit false claims, there is little danger of corporate contractors being held liable for innocent conduct. Accordingly, we decline the invitation to expand state sovereign immunity dramatically by extending it to corporate actors. *See Richardson v. McKnight*, 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997) (declining to extend sovereign immunity to prison guards employed by a private corporation managing a prison under contract with a state).

 The arm-of-the-state test for sovereign immunity is used to determine immunity from a wide variety of claims and is the proper analysis to be undertaken when determining immunity under the FCA. *See, e.g., Savage*, 343 F.3d at 1040–51 (applying arm-of-the-state test to determine sovereign immunity in a suit under

the Americans with Disabilities Act); *Aguon v. Commonwealth Ports Auth.*, 316 F.3d 899, 901–04 (9th Cir.2003) (applying the test in a § 1983 case); *Alaska Cargo Transp. v. Alaska R.R. Corp.*, 5 F.3d 378, 380–82 (9th Cir.1993) (applying the test in a suit alleging breach of contract, defamation, antitrust violations, and unfair trade practices); *Durning v. Citibank*, 950 F.2d 1419, 1423–28 (1991) (applying the test in a suit alleging securities fraud); *Mitchell v. Los Angeles Comty. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir.1988) (applying the test in a suit alleging age discrimination, race discrimination, and other civil rights claims). Under the arm-of-the-state test, we examine the following factors: (1) whether a money judgment would be satisfied out of state funds; (2) whether the entity performs central governmental functions; (3) whether the entity may sue or be sued; (4) whether the entity has the power to take property in its own name or only in the name of the state; and (5) the corporate status of the entity. *Mitchell*, 861 F.2d at 201. The rationale is that "a plaintiff who successfully sued an arm of the state would have a judgment with the same effect as if it were rendered against the State." *Alaska Cargo*, 5 F.3d at 380 (internal quotation marks omitted). Therefore, whether a money judgment would be satisfied out of state funds is the most important factor for sovereign immunity. *Savage*, 343 F.3d at 1041; *Alaska Cargo*, 5 F.3d at 380; *Durning*, 950 F.2d at 1424.

 We assume that managing the reconstruction of state university buildings is a central government function. *See Durning*, 950 F.2d at 1426 (noting that the Court construes the second *Mitchell* factor broadly). However, all other factors weigh against granting DMJM sovereign immunity. There is no evidence suggesting that CSUN would have a legal obligation to pay any judgment against

DMJM. *See Regents of Univ. of Cal. v. Doe,* 519 U.S. 425, 432, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997) (clarifying that legal liability, rather than a contractual obligation to indemnify, is the relevant question). Additionally, DMJM is a private corporation, it may sue or be sued, and it has the power to take property in its own name. Because four of the five *Mitchell* factors weigh against granting DMJM sovereign immunity for their actions on behalf of CSUN, we hold that DMJM may be held liable under the FCA if Ali can demonstrate that DMJM knowingly submitted false claims to FEMA. *See Durning,* 950 F.2d at 1426–28 (holding that an entity was not immune where only the "central government functions" factor weighed in the entity's favor).

## C. False Claims Allegations

As noted above, the court may affirm summary judgment on any ground, even if not relied upon by the district court. *Simo,* 322 F.3d at 610. DMJM is entitled to summary judgment if there is no genuine issue of material fact as to whether the corporation knowingly presented or caused to be presented to FEMA a false or fraudulent claim for payment or approval. *See* 31 U.S.C. § 3729(a). DMJM argues that it is entitled to summary judgment because there is no genuine issue of material fact with respect to (1) the existence of a false claim and (2) whether DMJM knowingly submitted any false claim. Viewing the evidence in the light most favorable to Ali, as is appropriate for summary judgment, we conclude that there is a genuine issue of material fact as to whether DMJM knowingly submitted a false claim to FEMA.

### 1. Is there evidence that DMJM presented a false claim to FEMA?

 Under the regulations applicable to CSUN's FEMA claims, "Facilities that were not in active use at the time of the disaster are not eligible except in those instances where the facilities were only temporarily inoperative for repairs or remodeling, or where active use by the applicant was firmly established in an approved budget or the owner can demonstrate to FEMA's satisfaction an intent to begin use within a reasonable time." 44 C.F.R. § 206.226(k)(2). If, before the earthquake, CSUN did not intend to begin use of the UTA within a reasonable time, the University was not eligible to receive FEMA reimbursement for repairs of that building.

The UTA was closed in 1991,[4] due in part to a decline in enrollment at CSUN. Thus, the building had been unoccupied for more than two years at the time of the earthquake. The C/C Study on the feasibility of repairing the UTA was released on December 15, 1993. The next day, the Board of the CSUN Foundation voted against acting on the proposal contained in the C/C Study. The minutes of the meeting reflect that the Board members discussed whether the need for student housing would justify the costs of repair. A vote on whether to "approve in principal the continued consideration of the proposal of Foundation management for the development of the University Tower and University Village Apartments with all details and all assumptions to be determined after

---

4. The year that the building was closed is disputed. DMJM's materials state that it was closed in 1993. However, Ali points out that there is a 1993 letter in the record from Don Caskey of Coleman/Caskey Architects stating that the building had been closed for approximately two years, and referencing a 1991

study on the feasibility of repairs. Similarly, the C/C Study refers to itself as a "Feasibility Update" of a "Feasibility Study conducted in September 1991." Because we must view the evidence in the light most favorable to Ali, we assume that the building was closed in 1991.

the vote" failed 4–5 with 2 abstentions. On January 17, 1994, the Northridge Earthquake severely damaged the building.

In April 1994, Bill Chatham, a CSUN official, sent FEMA a letter that stated that the UTA was unoccupied before the earthquake, the University was considering various improvements and options for use, and a decision had not been made on how to proceed. The allegedly fraudulent Communications from DMJM employees were written in 1996 in response to continued FEMA concerns about the UTA's funding eligibility. At a January 1996 reconstruction coordinating meeting, a FEMA official asked whether the building was occupied before the earthquake. Bill Chatham told him that it was not, but that, prior to the earthquake, the UTA had been scheduled for reoccupancy.

The Communications state that the UTA was closed in early 1993, "due to modifications required to bring the building to meet current code requirements." Furthermore, they state, "the University commissioned a comprehensive feasibility study to bring this facility to current codes and standards which was prepared by COLEMAN/CASKEY ARCHITECTS, INC., dated December 15, 1993," and "[t]he architectural report . . . clearly indicates the University's intention to re-occupy the facility to its intended use, and was, at the time of the earthquake conducting due-diligence studies to bring the facility back into operation." The Communications do not mention that the CSUN Foundation had voted the day after the C/C Study was released not to pursue the repairs discussed in the study, but rather state, "No funds were appropriated for the restoration of this facility based on the outcome of the feasibility study, due to the occurrence of the Northridge Earthquake."

Former CSUN President Wilson stated in her deposition that the University was considering demolishing the UTA at the time of the earthquake. Additionally, she stated that in order to receive funding from the University to repair the UTA, a capital budget request would have to be submitted, which would entail a "rather elaborate and very specific process." "[G]etting on the capital list and getting a project is a very, very long shot. So something like this [repairing the UTA] would not have been the highest priority for the university." Finally, Wilson admitted that the sentence "No funds were appropriated for the restoration of this facility . . . due to the occurrence of the Northridge Earthquake" was misleading.

Ali submitted a declaration from Peter Mutty, the FEMA official who provided initial approval of the UTA funding, which stated that his approval was based in part on the Communications. When he approved the funding, Mutty did not know that the Foundation had voted against taking further action on the C/C Study or that CSUN was not in the process of obtaining funding to repair the UTA at the time of the earthquake. Mutty stated that if he had been aware of this information at the time he approved the funding request, he would not have approved it and would have found the UTA ineligible for FEMA funding. Additionally, Mutty clarified that if the University was considering demolishing the UTA, it could not satisfy the requisite intent to reoccupy within a reasonable time. Ali submitted a similar declaration from another FEMA official who stated that he recommended approval of UTA funding on the basis of the DMJM Communications and that he would not have done so if he had known that the CSUN Foundation had voted not to take action on the C/C Study.

Viewing the evidence in the light most favorable to Ali, a reasonable factfinder could conclude that the Communications prepared by DMJM fraudulently misrepresented the University's intention to reoccupy the UTA in light of (1) the Communications' understatement of how long the building had been unoccupied; (2) the statement that the C/C Study clearly indicates the University's intention to reoccupy the UTA; (3) the omission of the Foundation's decision not to continue consideration of the proposals in the C/C Study; (4) the statement that "No funds were appropriated ... based on the outcome of the feasibility study, due to the occurrence of the Northridge Earthquake"; and (5) statements in Mutty's declaration and former CSUN President Wilson's deposition. Therefore, we conclude that there is a genuine issue of material fact as to whether DMJM presented a false claim to FEMA.[5]

2. *Is there evidence that DMJM presented any false claim knowingly?*

████ To establish an FCA violation, the relator must show that the defendant knew the claim was false, acted in deliberate ignorance of the truth or falsity of the claim, or acted in reckless disregard for the truth or falsity of the claim. *See* 31 U.S.C. § 3729(b); *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1477–78 (9th Cir.1996). Negligence and innocent mistake are insufficient to meet the intent requirement under the FCA. *Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1420 (9th Cir.1992).

██ DMJM employee Retamal prepared the allegedly fraudulent Communications, and DMJM employee Duncan, his supervisor, approved both documents.

Their declarations state that they believed that the contents of the documents were accurate when they submitted them to FEMA. Duncan instructed Retamal to write the Communications relying on the C/C Study after discussing the matter with his supervisor. Duncan stated in his deposition that he did not read the C/C Study, nor did he speak with anyone at CSUN other than his supervisor about its significance. Duncan also stated that he was aware that the C/C Study had been discussed at a December 1993 meeting of the Foundation, but made no effort to find out what happened at that meeting. Retamal also stated in his deposition that he did not discuss the C/C Report with anyone other than Duncan. Thus, Duncan and Retamal, who had no direct knowledge of the CSUN's intentions for the UTA before the earthquake, drafted the Communications stating that the C/C Study clearly indicates the University's intention to reoccupy the UTA, without investigating the truth of that claim.

DMJM points to evidence supporting its argument that Duncan and Retamal did not act with the requisite intent to support an FCA claim. On summary judgment we cannot weigh evidence, but must view the evidence in the light most favorable to Ali. The evidence is sufficient to raise a triable issue of material fact as to whether Duncan and Retamal, by preparing the Communications in this manner, acted knowingly or with reckless disregard for or deliberate ignorance of the truth or falsity of the representations in the letter. *See* 31 U.S.C. § 3729(b).

### III. CONCLUSION

The district court erred in concluding that DMJM is immune from suit for any

---

**5.** DMJM contends that summary judgment should be affirmed because the allegedly misleading statements in the Communications were immaterial to FEMA's funding decision.

In light of the discussion above, we reject this argument and do not address whether materiality is a required element of an FCA claim.

false claims submitted to FEMA in its capacity as a construction management firm for CSUN. DMJM is a private corporation and was not acting as an arm of the state for sovereign immunity purposes. Summary judgment cannot be affirmed on alternate grounds, because Ali raises genuine issues of material fact as to whether DMJM, through its employees Duncan and Retamal, knowingly submitted false claims to FEMA.

**REVERSED AND REMANDED.**