## Lightfoot v. Commonwealth.

February 1, 1949.

As Modified on Denial of Rehearing May 20, 1949.

Malcolm R. Rhoads for appellant.

A. E. Funk, Attorney General, and William J. Wise, Commonwealth Attorney, for appellee.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER—Affirming.

Between 7:30 and 8:00 o'clock on the morning of Monday, May 12, 1947, the body of Harvey Childers was found in the back room of the Bridge Cafe in Newport. He was 84 years of age and had been employed as a night watchman by his son-in-law, the proprietor of the Cafe. He had been beaten brutally by someone using both sharp and blunt instruments. His assailant robbed him of approximately $80 in cash, and took between $350 and $400 from a cigar box secreted under the bar in the front room of the Cafe. Adjacent to the barroom were two additional rooms for the convenience of feminine patrons of the Cafe. The first was a cubicle in back of which was the second, a wash room. These rooms were connected by a door which, when opened, constituted the hypotenuse of a triangular space closed on the other two sides by walls. There was sufficient room in the triangular space for a person to hide and, so long as the door remained open, not to be seen. Officers called to the scene of the accident discovered a cot, clothed with pillow and army blanket, in the barroom. The pillow was saturated with beer, and brown glass from a broken beer bottle was discovered on the bed of the cot. Additional glass and blood were found on the floor. The deceased's trousers and shoes were lying on the floor near the cot, and a poker stained with blood was standing against the wall on a table. An empty pocketbook was found nearby, and there was no money in the clothes of the deceased. At the time of its discovery, the body of deceased was clothed with shirt and underwear, and on a table near the body a revolver, identified as the one furnished the deceased by his employer, was found. The revolver con-

tained one spent cartridge and four (4) loaded ones. A great quantity of blood was found on the floor and other objects in the room near the body.

Doctor Rust, who performed a post mortem examination, described the wounds on the body. He stated that the entire skull was cut in ribbons and lacerations on the head were so numerous that it was impossible to count them. There was "a massive hole" above the right ear measuring three (3) or four (4) inches in length and two and one half (2½) inches in width and the skull at that point had been "depressed, pushed down on, and driven into the brain." Death was caused by a compound comminuted fracture of the skull. There were bruises over the body in general, the third and fourth fingers of the left hand practically were amputated, and there was a laceration on the sole of one of the feet. The blow which caused the fracture was inflicted by the use of a blunt instrument whereas the lacerations were caused by the use of a sharp instrmuent.

Fifteen days following the discovery of Mr. Childer's body, to wit: May 27, 1947, appellant was arrested by police officers in Newport on a charge connected with the commission of another crime. In the meantime, members of the police department of the city of Newport had questioned all persons, except appellant, who were known to have been present in the Cafe on the afternoon and night previous to the finding of Mr. Childers' body. At the time of his arrest appellant was helplessly under the influence of intoxicants or drugs, and, according to his own testimony, had been drinking large quantities of whiskey and swallowing large quantities of benzedrine which is a drug often used as a heart stimulant. On account of his drunken condition he was placed in a cell in the Newport jail and allowed to remain until ten minutes before 1 o'clock on the following afternoon, at which time he was conducted to one of the offices occupied by the police department where he was questioned concerning his possible knowledge of the assault on Mr. Childers. At first he denied any knowledge of the occurrence but shortly made a verbal confession, which was reduced to writing and read to him. He then signed and acknowledged the written confession under oath in the presence of three officers and a notary public. The confession, purported to have been signed at 1:15 o'clock p. m., twenty five minutes after he was brought from his cell, follows:

"I, Lawrence Benjamin Lightfoot, present address, Magnolia Hotel, Covington, Kentucky, age 27 years, make the following statement concerning the murder of Harvey Childers at the Bridge Cafe, S. E. Corner Fourth and Patterson Street, Newport, Kentucky, on the morning of May 12, 1947:

"On Sunday, May 11, 1947, about 1:00 p. m. I went to the Bridge Cafe and stayed there all afternoon and evening until closing time. At 12 o'clock that night I went to the ladies rest room and stood behind the second door in the wash room. About 1:00 a. m. on the morning of May 12, 1947, I came out of the rest room. The old man was lying on a cot in the barroom. I took beer jugs and hit him in the head about four or five times. The old man was lying in bed and he fired one shot at me. The old man came into the back room and I hit him a few more times with beer bottles. I ran out in the barroom and got a poker and hit him with it.

"I took from the pants pocket of the old man between $70.00 and $80.00. I also took from behind the bar a sum of money amounting to $350.00 or $400.00 in all. I then went out the side door. This was sometime shortly after 1:00 a. m., and I walked to Patterson St. and up Fifth St. I stopped at the Oil Station at Fourth and York Sts. and washed the blood off of my hands at the faucet on the side of the Station.

"I then went to Cincinnati, Ohio and from one barroom to another drinking day and night and spending most of the money. On Wednesday morning, May 14, 1947, I went to New York, and I returned from there on Saturday, May 24, 1947, at 10:30 p. m. I spent Saturday night, May 24, 1947, in the Dixie Terminal, Cincinnati, Ohio. I loafed all day Sunday. I spent Sunday night, May 25, 1947, in the Dixie Terminal, Cincinnati, Ohio, and on Monday, May 26, 1947, I went to my mother's home, (n. e. corner Forest and Saratoga Sts., second floor, Newport, Ky.) to get a couple of hours rest in a bed and a meal. My mother was not home. I walked to the Newport Post Office to see if any mail was there and, much to my surprise, there was a compensation check. I went from there to the Magnolia Hotel, Covington, Kentucky, and paid my room rent for a couple of days. From that time on my time was spent drinking continuously in various bars in Newport, including the Bridge

Cafe, until arrested on May 27, 1947, by Detectives Fredericks and Schlosser, for Breach of the Peace:

"I, Lawrence Benjamin Lightfoot, having been first duly cautioned and sworn, and having fully read the foregoing statement, say that same is a truthful and complete confession of the foregoing crime and is voluntarily given without having had extended to me any promise or commitment and likewise has been given by me without any coercion, force or pressure of any kind, having been brought to bear upon me in making this statement.

"Subscribed and sworn to by Lawrence Benjamin Lightfoot, before me a Notary Public in and for Campbell County, Kentucky, this 28th day of May, 1947."

Thereafter, he was indicted, tried, convicted, and sentenced to die in the electric chair, for the murder of Mr. Childers. We will discuss the grounds urged for reversal in the order complained of in appellant's motion for a new trial.

The first ground is that the verdict is contrary to the law and evidence. It is argued that the testimony of Doctor Piker a psychiatrist of Cincinnati introduced by appellant, and that of Doctor Farris, a specialist on internal medicines introduced by the Commonwealth, show that appellant did not have sufficient mental capacity to know right from wrong, and at the time of the purported confession he was under the influence of drugs, therefore was not responsible for any statement he may have made, and the confession was coerced from him by plying of questions contrary to the provisions of KRS 422.110.

We think the medical testimony shows the exact opposite of that contended by appellant. Doctor Piker testified that appellant's intelligence was limited to some degree but he definitely was not feeble minded; that he is a chronic alcoholic with some tendency in the direction of drug intoxication "and that he has a psychiatric personality." He stated that the above findings indicate without question that appellant has not been living a normal existence, has not been able to sustain himself in an ordinary fashion, has not been able to fit into society or to keep himself from getting into trouble of various sorts: physical, social, and emotional, and that he is not "from the phychiatrists' point of view to be consid-

ered mentally and emotionally competent.'' The witness elaborated further ''I would like to point out at this point though that I am talking psychiatry. I am sure I will be asked, so I am trying to anticipate it, whether this man is sane or insane, competent or incompetent according to legal terminology. I could not say this man is insane from a legal point of view.'' He clearly defined the test for mental competency of a person charged with crime. He then stated that in his opinion at the time of the examination, as well as at the time the crime was committed, appellant knew right from wrong and met the test of legal competency applicable to persons charged with crime. Doctor Farris testified that benzedrine is a heart stimulant and has the effect of rendering the person under its influence more alert but does not have any lingering effect on the patient, either stimulative or depressive. Appellant testified that a few minutes before he was questioned concerning his participation in the crime he swallowed a dose of benzedrine, but the medical testimony shows that had he done so its effect would have made him more, not less, alert and cautious during the period of time he confessed to the crime.

We turn our attention to the argument that the confession was obtained as a result of the officers plying appellant with questions in contravention of KRS 422.110, supra. One of the officers testified that appellant verbally related substantially all of the facts contained in the written confession previous to signing the writing. After the officer related the substance of the verbal confession, he was presented with the written confession and was asked to identify and introduce it in evidence. No objection was made to his previous testimony, and appellant objected to the introduction of the written confession solely on the ground that the stenographer's notes were the best evidence of what was contained in the written confession. The Court properly overruled this objection because appellant signed and swore to the writing, not the notes. Since no other objection was made to the confession, the Court properly admitted it in evidence.

But eliminating from our consideration the confession complained of, there was sufficient evidence to warrant conviction. Appellant's defense was an alibi testified to by him on the trial. He admitted having been in Newport on the day and night before and the morning

of the day of the commission of the crime, but related that he had been exceedingly drunk on Saturday night and did not arise until almost noon on Sunday, May 11. He waited on the steps of his hotel until the barroom opened that afternoon. After consuming two or three beers he stated that he went to a picture show. He gave the title of the picture, the general scheme of the plot, and named the principal actors. He stated that because he had nothing else to do he remained for the second showing of the picture. He took a walk after leaving the theater, retired early in his room at the hotel, and did not awaken until about 9 o'clock the following morning. He testified that he did not visit the Bridge Cafe at any time during the afternoon, evening, or night of May 11. He further related that he started a journey to New York on May 13th and returned to Newport May 24th three days before his arrest. The Commonwealth introduced the manager of the theater, which appellant testified he had attended on the afternoon of May 11. This witness testified that the picture appellant described had its last showing in that theater on Saturday, May 10th, and that another picture with other players, depicting an entirely different plot was shown on the afternoon and night of May 11. Appellant was well known to the management, employees, and regular patrons of the Bridge Cafe. The owners, bartender, and several patrons testified they saw appellant at the Bridge Cafe on May the 11th, and their combined testimony placed him there almost continuously from early afternoon until a few minutes before the closing hour. One of these witnesses, Mary Becker, stated that she saw appellant enter the ladies rest room at about 11:45 p. m. and did not see him return therefrom. She additionally testified that after appellant returned from New York, but before his arrest, she heard him on two occasions admit to his mother that he had murdered Mr. Childers, and on one of these occasions he described the commission of the crime substantially, but not as fully, as he described it in his confession. It is apparent that the evidence was sufficient to sustain the verdict of the jury.

The second ground is that the Court should have granted a new trial because of important evidence discovered after the trial. The affidavit in support of this ground recites "affiant further states that Bobby Daniels represented to him that he was present at the Bridge

Cafe Sunday night, May 11, and Monday morning, May 12, 1947 until 1:30 a. m. and that during said time the affiant was not present and that he was in both wash rooms and that the affiant was not concealed in said wash room. Affiant further states that if said Bobby Daniels were to testify he would testify substantially to the facts heretofore stated. Affiant further states that after exercising due diligence he did not discover this evidence." This affidavit was signed by appellant. He filed another affidavit signed by his mother in which she stated that the statement made by Mary Becker to the effect that appellant murdered Harvey Childers is untrue and that she did not see her son after the murder until he was lodged in the Newport Jail. She further stated that Mary Becker told her that she had no knowledge whatever of appellant's being connected with the murder. Accepting the statement contained in these affidavits as true there is nothing in either affidavit to indicate that either of the witnesses was not available at the first trial or that this evidence was discovered after the first trial and could not have been discovered previous thereto.

The third ground for reversal is that the Court erred to appellant's prejudice in sustaining the Commonwealth's objection to a question propounded to the jurors as a whole. The question was: whether they or any member of their families held any political office or were employed in any political office, or capacity in Campbell County or any municipality thereof. Undoubtedly the Court erred in sustaining the objection to this question because a litigant is entitled to make inquiry of jurors in respect to any matter which will throw light on the background of the juror in order that the litigant may the better exercise his discretion in respect to peremptory challenges; and since a peace officer may be excused for cause, KRS 29.030(2) (b) the question, confined as it was to the status of the jurors at the time of the trial, was particularly pertinent. But whether such error was prejudicial depends on the circumstances and the answer the question would have elicited had the Court overruled the objection. Appellant contends that the juror Ewing had been a deputy sheriff and at the time of the trial was "an honorary member of the sheriff's office and was holding himself out as being associated with the sheriff's office." Counter affidavits filed by the Common-

wealth's attorney, the sheriff, and the county clerk show that at the time of the trial Mr. Ewing was not a deputy. That being true his answer to the question propounded would have been in the negative and since no question was asked of the jury or any member thereof concerning previous connections with the sheriff offices or previous official positions we are of the opinion that the Court's error did not prejudice appellant's substantial rights.

Counsel for appellant vehemently charges that the trial judge misled him to the prejudice of his client into believing he would be permitted sixteen peremptory challenges instead of the fifteen allowed by law. Section 203, Criminal Code of Practice. The facts giving rise to this charge are: One of the jurors after being accepted by both parties became ill and over objection of appellant (but which objection now has been withdrawn) was excused from serving as a member of the panel. At that time appellant had exercised his right of peremptory challenge on fourteen members of the regular panel and the special venires, and had but one remaining. He suggested to the Court that because the incapacitated juror was excused he should be permitted an additional challenge. The judge replied that if the situation warranted such action the Court would have no hesitancy in granting the additional challenge. Thereafter the Court concluded that under Section 203 of the Criminal Code of Practice he did not have the legal right to grant more than fifteen peremptory challenges and he refused appellant's request when finally made. Appellant does not contend that he should have been given more than fifteen challenges but that the trial judge misled him and, in reliance on the misleading statement, he exercised his fifteenth challenge. We do not see how the Court's statement can be construed as a promise to violate a provision of the Code; but if it could be given this construction, counsel for appellant knew or should have known that such action would have been in violation of the Code. Under these circumstances he cannot claim to have been misled. In all fairness to the learned judge who presided, his statement amounted to no more than a reservation of ruling on the question until better advised and until such time as it might properly have been presented to him.

The next complaint is directed at the Court's action in calling three by-standers to fill the jury panel. The

original panel was drawn from the regular wheel. When exhausted the Court drew two special panels of fifty and twelve names respectively, both of which were exhausted before a full jury qualified and was accepted. The Court then ordered the sheriff to summons three by-standers, from which number the two remaining jurors were selected. This practice is in absolute conformity with KRS 29.280 and Section 192 of the Criminal Code of Practice.

The next complaint is that the Court erred to the prejudice of appellant in failing to give an instruction based on self defense. The basis of this contention is that since the evidence for the Commonwealth was solely circumstantial and there was evidence of a struggle at the scene of the crime, the Court was required, under previous decisions of this Court, to instruct on the whole law of the case including self defense. In support of this contention appellant cites Rutherford v. Commonwealth, 13 Bush 608; Fletcher v. Commonwealth, 239 Ky. 506, 39 S. W. 2d 972; and Marcum v. Commonwealth, 305 Ky. 92, 202 S. W. 2d 1012, and cases cited therein. In those cases the principle invoked by appellant is set out and substantially is: That where the evidence is purely circumstantial and surrounding conditions indicate that there was a struggle at the time of the commission of a homicide it is the duty of the trial Court to instruct on every phase and degree of the offense charged in order that the jury may render a verdict upon any inference it may draw from the circumstances proven in the case, including self defense. It is unnecessary for us to determine whether admissions and confessions of appellant constitute the testimony of an eye witness sufficiently to render the rule inapplicable in this case, because we think that all of the circumstances show beyond peradventure of a doubt that the homicide was committed in pursuance of the commission of the crime of robbery and in which state of case the perpetrator of the crime may not rely on the plea of self defense. Kirk v. Commonwealth, 192 Ky. 460, 233 S. W. 1060, 1064.

Finally the complaint is made that the Commonwealth's attorney in his closing argument overstepped the bounds of propriety in stating to the jury that if appellant should be given a mere life sentence he would be eligible for parole in eight years. Assuming without deciding that the statement made by the Commonwealth attorney is subject to criticism we are of the opinion

that it could not have had the prejudicial effect complained of. The jury believed the evidence introduced by the Commonwealth beyond a reasonable doubt and the circumstances surrounding the commission of the crime as presented by the evidence for the Commonwealth were so vicious and atrocious that there was scarcely anything outside the record which could be brought to the attention of the jury to further inflame their minds.

As we do in all cases where the death penalty has been inflicted, we diligently have searched the record in an endeavor to find a prejudicial error. Our search has been in vain. We are of the opinion that appellant has been accorded a fair and impartial trial; wherefore the judgment must be, and it hereby is, affirmed.