## NeCamp v. Commonwealth.

December 9, 1949.

R. Howard Smith for appellant.

A. E. Funk, Attorney General, Walter C. Herdman, Assistant Attorney General, and Wm. J. Wise, Commonwealth Attorney, for appellee.

STANLEY, COMMISSIONER—Reversing.

As stated in Maddox v. Commonwealth, 311 Ky. 685, 225 S. W. 2d 107, William NeCamp was also convicted of the murder of Louis Monkedick in Newport in March, 1946, and the death penalty imposed. He was tried a month after Maddox. The evidence of the Commonwealth in this case is substantially the same, perhaps stronger because the witness, Fenton, related more details of the occurrences and admissions at his home that night, and some additional evidence of identification of the things taken in the robbery of the saloon.

It is urged on the appeal that Fenton, Stephenson and Champlin were accomplices and their evidence was not corroborated. Though the court, out of caution, had

given instructions on corroboration of accomplices in the Maddox trial, there was nothing in the record showing these men to have been such. But on this trial NeCamp testified that when the saloon was being robbed, Stephenson and Champlin were located as lookouts. They may, therefore, be regarded as accomplices, but there is no proof that would so classify Fenton. It is doubtful that the evidence showed him to be an accessory after the fact, but even if it should be so regarded, he was not an accomplice in the commission of the crime of feloniously breaking and entering the saloon, or of murder. Roberson's Kentucky Criminal Law, Sec. 191. Reed v. Commonwealth, 270 Ky. 447, 109 S. W. 2d 1198. The court gave proper instructions on this feature of the case and there was abundant evidence tending to corroborate Stephenson and Champlin, including the testimony of the defendant himself.

NeCamp was brought from the federal penitentiary in Atlanta for this trial. He admitted having been four times convicted of a felony, possibly more, although only 26 years old. He testified that he and the other men had had no prearrangement to meet or to rob the Heringer saloon, but he described how he and Maddox had broken into and entered it. As they started around the bar, he heard someone holler, "Get out of here." He turned and fled from the building and went to the automobile with Stephenson and Champlin and waited a few minutes until Maddox joined them. They then drove to Fenton's house. NeCamp's story as to what occurred there differs from that related by the other witnesses only as to some of the details. He denied making any of the incriminatory statements attributed to him. He denied striking Monkedick and having any pistol or blackjack on that occasion. The defendant's two sisters testified that their father had been in the mental hospital at Lakeland for fourteen years or more and indicated that the defendant had not had a fair chance in life. This was his entire defense.

During the course of the Commonwealth attorney's direct examination of Frank Champlin he asked him about having been interviewed by two police officers from Newport in April, 1948, the interview being stenographically reported. The attorney then proceeded to ask the witness if he had then been asked and answered

certain questions concerning eight or more different matters. The witness replied that he had made the answers as read to him. An examination of his preceding testimony shows that he had testified not only substantially to the same thing, but in some instances exactly the same. There was absolutely no contradiction between his testimony and his interview, and no reason for refreshing his memory. The effect of this was to double up the testimony and inject into the record the same statements not sworn to at the time. All this was incompetent, but it cannot be said to constitute a reversible error.

It may be observed that the testimony of the police officers as to their journeys to see Fenton in the penitentiary at Terre Haute, Indiana, and Champlin in the army camp in Virginia, and obtaining statements from them was irrelevant and should have been omitted; but the admission could not have been in any way prejudicial. There was nothing unfair or illegal, however, for the officers to get such statements without notice to the defendant, as he now contends.

The argument of the Commonwealth's attorney that if a life imprisonment should be imposed on the defendant, he would be subject to parole in eight years was not a reversible error. Lightfoot v. Commonwealth, 310 Ky. 151, 219 S. W. 2d 984; Powell v. Commonwealth, 276 Ky. 234, 123 S. W. 2d 279.

By consent the jury were permitted to separate during the trial. What follows indicates the danger that may arise from the practice.

In support of the defendant's motion for a new trial, an affidavit was filed showing that during the course of the jury's deliberations, one of the women jurors had become hysterical and was holding out against imposing the death penalty. Mrs. Fannin, one of the jurors, put her arms around the woman and told her it would not be any sin; that she had confided in her priest and he had advised her it was all right. In opposition, and in support of the verdict, the Commonwealth filed Mrs. Fannin's affidavit in which she related that, entertaining some scruples with respect to the morality of imposing a death penalty about which she had been extensively questioned before her acceptance as a juror,

she had inquired of a priest concerning what, if any, moral guilt would attach to a member of a jury in the trial of a case involving a possible death sentence, and that he had informed her that in the eyes of the church no moral guilt would attach to any Catholic member of a jury so long as the juror acted in good conscience and formed an honest opinion based upon the evidence alone. She stated she had not told the priest she was serving on a jury or talked to him or anyone else about the case and had not at the time formed an opinion as to it. The affiant admitted she had made that statement during the course of the jury's deliberations.

The misconduct is obvious.

Section 272 of the Criminal Code of Practice as construed by this court, declares that a juror cannot be examined to establish a ground for a new trial (except that the verdict was made by lot) and that affidavits of jurors cannot be received to impeach their verdict but can be considered to support it. Wolf v. Commonwealth, 214 Ky. 544, 283 S. W. 385. The reason for this rule, which is generally recognized independent of a statute, is, in its essence, that experience has shown that it is more likely to prevent than it is to promote the discovery of the truth. It is particularly related to the discussion of the jurors during their deliberations, which are intended to be and should be private, frank and free. In some jurisdictions, however, the rule has been changed by statute to allow affidavits of jurors to show misconduct. In others, the rule is held not to extend to conduct of a juror outside the jury room, though there is authority to the contrary. 53 Am. Jur., Trial, Secs. 1105, 1111. In Drury v. Franke, 247 Ky. 758, 57 S. W. 2d 969, 88 A. L. R. 917, it was held competent to consider statements of jurors as to their experience in automobile accidents for the purpose of showing the misleading character of their failure to answer on their voir dire examination whether any of the panel had been involved in an automobile collision.

In the present case, we may ignore the affidavit filed by the defendant, as to what occurred in the jury room. But we have an affidavit filed by the Commonwealth in support of the verdict. It doubtless was intended to show that what did occur was not wrong and did not constitute misconduct. Nevertheless, this sup-

porting affidavit does in fact reveal misconduct as measured by the law. It is a disclosure made by the Commonwealth itself that the juror during the trial had conferred with another and carried the advice into the jury room. Perhaps this interpretation of the affidavit as being in support of and not to impeach the verdict is not the perfection of logic. But with the life of a man at stake, and that life to be taken by processes of the law, the reality and the actuality of the situation ought, under such circumstances, to be recognized. The court will not be blinded by too strict an interpretation of this technical rule of evidence, the reasons for which not existing in the present case. Legal technicalities ought not afford justification for ignoring the plain facts before us—facts which vitiate a verdict and judgment that will take a human life. We abhor the ancient veneration for legal form which often prostituted substantive justice and produced inhumane consequences. Such judicial practice is condemned by law of more sublime origin and more awful sanction than any human code. The appellant, NeCamp, is shown to be a confirmed criminal, an enemy of society. But society cannot ignore its legitimate concept of justice even for such an insubordinate member. As stated by the Supreme Court of the United States not long ago in regard to a heinous crime: "A shocking crime puts law to its severest test. Law triumphs over natural impulses aroused by such a crime only if guilt be ascertained by due regard for those indispensable safeguards which our civilization has evolved for the ascertainment of guilt. It is not enough that a trial goes through the forms of law. * * * Of course society must protect itself. But surely it is not self-protection for society to take life without the most careful observance of its own safeguards against the misuse of capital punishment." Fisher v. United States, 328 U. S. 463, 66 S. Ct. 1318, 1325, 90 L. Ed. 1382, 166 A. L. R. 1176.

We are of opinion, therefore, that the judgment should be, and it is reversed.