Victor Dewayne TAYLOR, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2004–SC–0018–MR.

Supreme Court of Kentucky.

May 19, 2005.

As Modified on Denial of Rehearing
Nov. 23, 2005.

Margaret F. Case, Thomas M. Ransdell, Assistant Public Advocates, Department of Public Advocacy, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General of Kentucky, David A. Smith, Ian G. Sonego, Assistant Attorneys General, Criminal Appellate Division, Office of the Attorney General, Frankfort, Counsel for Appellee.

Opinion of the Court by Chief Justice LAMBERT.

Once again this Court is faced with deciding an issue that arises from one of the most heinous and highly publicized murder cases in Kentucky's recent history. Victor Taylor was convicted of the murder, kidnap, and robbery of two Trinity High School students as they were on their way to attend a high school football game. Taylor was also convicted of sodomizing one of the students. As a result, he received two death sentences for the murder convictions, two death sentences for the kidnapping convictions,[1] and a total of sixty years imprisonment for the two counts of robbery and one count of sodomy. This appeal comes to this Court upon denial of his CR 60.02 motion for a new trial.

Taylor asserts that he is entitled to a new trial for two reasons, and seeks a declaratory judgment as to the constitutionality of KRS 422.285. First, he claims that the recanted testimony of his co-conspirator, George Wade, suffices to exculpate him from guilt, entitling him to a new trial. Second, Taylor claims that a juror's false responses to questions about her views on capital punishment during *voir dire* entitles him to a new trial. Finally, Taylor argues that KRS 422.285 is unconstitutional because it infringes upon the Supreme Court's rule-making authority under § 116 of the Constitution of Kentucky. We affirm the trial court's denial of Taylor's CR 60.02 motion; and we find that KRS 422.285 is an unconstitutional infringement upon the Supreme Court's rule-making prerogatives, but we extend comity to the statute and will enforce its provisions.

## I. Facts

The facts of this case are recorded in detail in this Court's opinion by Justice Wintersheimer on direct appeal, so we will rely in large part upon that recitation.[2] Therefore, we reiterate only the pertinent facts to the issues currently before us. On Saturday, September 29, 1984, high school students Richard Stephenson and Scott Nelson stopped at a restaurant to ask for directions to a high school football game. While at the restaurant, Taylor and Wade kidnapped the students at gunpoint. Cecil Pepper and Dino Pace testified that they witnessed the abduction and followed the car a few blocks until it turned down a side street. Both Pepper and Pace identified Taylor as the kidnap gunman. After reaching a secluded area, Taylor and Wade forced the students to get out of the car. In an attempt to rob them, Taylor and Wade forced them to take off their clothes and hand over their personal property.

---

1. Taylor's two death sentences for the kidnapping convictions were reversed on direct appeal in *Taylor v. Commonwealth,* 821 S.W.2d 72, 77 (Ky.1990).

2. *Taylor,* 821 S.W.2d 72.

After the boys had taken off their clothes, Taylor sodomized one of them. To avoid being turned in to the police by the victims, Taylor shot each of them in the head. Their bodies were each found with a gunshot wound to their temples from point-blank range.

The tattered and partially-clothed bodies of the victims were found early the next morning and an investigation ensued. A few days later the police arrested Taylor and Wade based upon an abundance of evidence both physical and testimonial. Wade was convicted first, and then Taylor was taken to trial partially upon a statement made by Wade to police, which is a subject of this appeal.

## II. Wade's recantation

■■■ Taylor's CR 60.02 motion can be separated into two issues. We take them one at a time. First, Taylor argues that he is entitled to a new trial because Wade recanted his statement to the police that Taylor was with him when he kidnapped, sodomized and killed the boys. Wade made this statement at Taylor's RCr 11.42 evidentiary hearing in 1997, which was more than eleven years after Taylor's conviction. The trial court ruled that Wade's new testimony that contradicted his previous testimony was not enough to entitle Taylor to a new trial, and that ruling is reviewed for an abuse of discretion.[3] In denying relief pursuant to CR 60.02, the trial court cited *Hensley v. Commonwealth*[4] for the proposition that recanted testimony of a trial witness is viewed with suspicion and does not normally warrant a new trial. In *Hensley*, a "vital witness" testified that the defendant was the only one shooting when

the decedent was killed. That "vital witness" later recanted and stated in an affidavit that he was not sure who shot the decedent and that "others were shooting at the time the decedent ... fell."[5] Justice Palmore, in an opinion rich in brevity, noted that this recantation was to be given little weight, and, as such, was not sufficient to entitle the defendant to a new trial.[6] The truism that recanted testimony is not reliable and should therefore be given little weight is even more relevant to this case. This is so because Wade recanted his statement that Taylor committed the heinous crimes against the Trinity students more than eleven years after Taylor's conviction, and only after the Parole Board denied him parole and ordered him to serve out the remainder of his sentence. The trial court did not find Wade's recantation credible. Therefore, we agree with the trial court's ruling that Taylor is not entitled to a new trial because of the recanted testimony.

■■■ However, though not briefed by the parties, we note that Wade's statement to the police admitted at trial was not subject to cross-examination. And, though this issue was considered on direct appeal, the United States Supreme Court has since held, in *Crawford v. Washington*, admission of this type of testimony to be violative of the Sixth Amendment's Confrontation Clause.[7] Specifically, the Court noted that out-of-court testimonial statements are inadmissible as a violation of the Confrontation Clause "unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-

3. *E.g., Averitte v. Hutchinson,* 420 S.W.2d 581, 582 (Ky.1967).

4. 488 S.W.2d 338 (Ky.1972).

5. *Id.* at 339.

6. *Id.*

7. 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

examination."[8] Here, though Wade was unavailable under KRE 804(a)(1), Taylor had at no time the ability to cross-examine Wade's statement to the police. Therefore, if *Crawford* is applicable, Taylor's constitutional right to confront witnesses against him was violated. However, that does not end the question, for Taylor is only entitled to a new trial if the error prejudiced him. In other words, if the admission of the statement amounted to harmless error beyond a reasonable doubt,[9] then this Court will not disturb Taylor's conviction.

To determine whether the admission of Wade's statement was harmless beyond a reasonable doubt, we must inquire whether excluding this evidence from the jury's consideration would have changed the result. And since the old trial cannot be recreated, we look to what might have happened upon retrial. In this case, though Wade's statement could not be used substantively at a new trial due to *Crawford*, if Wade testified to the contrary it would likely come into play because it would be inconsistent.[10] Therefore, this evidence in and of itself offers very little to Taylor in his attempt to show that using Wade's statement for substantive reasons is reversible error. But even if this statement were out of the universe of evidence that a jury would be allowed to consider upon a new trial, i.e., not admissible even as a prior inconsistent statement, it would not be enough to turn the verdict in his favor. The other evidence against Taylor is mountainous. And we are convinced that no reasonable jury could acquit Taylor of his deplorable crimes even if half the

evidence was stricken from its deliberations. In short, this is the precise type of case for which the harmless error rule exists.

The evidence that led the jury to return a guilty verdict against Taylor is too voluminous to recount in full. What follows is some of the highlights. Dino Pace and Cecil Pepper witnessed the events that took place at the restaurant where the boys were kidnapped, and they both identified Taylor as the man that kidnapped the boys at gunpoint. In fact, Taylor had stood in line next to them as they were ordering food. After the abduction, Pace and Pepper followed the car until it pulled off onto a side street. Pace and Pepper had ample opportunity to view Taylor. And though Taylor was not picked out in a photo line-up, both witnesses identified Taylor at trial as the gunman, and identified Wade in a line-up. Taylor was never placed in a line-up.

Jeffrey Brown, a jailhouse lawyer, testified that Taylor told him what happened as part of an attempt by Taylor to obtain legal advice. Taylor admitted to the shooting in his conversation with Brown, stating that he had to do it after Wade said Taylor's name as he was sodomizing one of the boys.

Eugene Taylor, Taylor's cousin, saw Taylor and Wade in a car with the boys on the night of the murder. Later that night Eugene also saw Taylor and Wade with a Trinity High School gym bag at Taylor's mother's house. Taylor and Wade were also in possession of a pair of gray tennis shoes, a pair of blue jeans, a Led Zeppelin

---

8. *Id.* at 1365.

9. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

10. KRE 801A(a)(1) allows a statement into evidence that would otherwise be excluded by the hearsay rule because the previous statement is inconsistent with the declarant's testimony at a trial or hearing in which the defendant has the opportunity to question the witness against him.

cassette tape, a watch, a ring, and some firecrackers. Eugene further testified that he overheard Taylor ask his sister whether the news had said anything about two white boys being murdered. Then Eugene heard Taylor tell his sister that he shot the two boys. Eugene further testified that Taylor exchanged pistols and money with his sister, and then divided the money with Wade.

Beverly Shackleford, who had known Taylor for more than ten years, testified that Taylor tried to sell her a Trinity class ring and school jacket on the morning after the murders. Neither the jacket nor ring of one of the boys had been found at the crime scene. The following Monday, three days after the killings, Shackleford again saw Taylor. This time she overheard Taylor admit to killing the boys because "it's a game. It's all about beating the system." Shackleford further testified that she overheard Taylor admit to the murders on two additional occasions.

There was additional evidence at the crime scene where the boys' bodies were found. Police found a beige shirt under a crawl space of a nearby abandoned house with African American hairs. That beige shirt was found along with one of the boy's blue jeans. Pace testified that Taylor was wearing a beige shirt at the restaurant when he and Wade kidnapped the boys. It was later determined that the shirt had some microscopic characteristics of Taylor's pubic and head hair. The bullets that had traveled through the boys' heads were also found at the crime scene. A firearms expert testified that those bullets were .357 Magnum semi-jacketed hollow point bullets and that they were fired from the same gun.

After an autopsy was performed on the boys, the coroner testified that he found sperm in the anus of one of the victims.

In the abduction car the police found the word "fag" written on the steering wheel. And in addition to finding various pieces of one of the boys' property, the police found firecrackers that matched those found at Taylor's mother's home and about which Eugene Taylor had testified.

At various times Taylor occupied two homes, one of which was owned by his mother and the other by his sister. At his mother's house police found several cassette tapes with the initials of one of the boys; twelve packages of firecrackers that matched those found in the boy's car and the testimony of Eugene Taylor; a Reader's Digest radio belonging to one of the boys; a pair of gray shoes belonging to one of the boys; a pair of beige suede shoes belonging to the other boy; and a silver clip with brown beads and white feathers, which had hung from the sun visor of the car owned by one of the boys. At Taylor's other address police found four live .357 magnum rounds manufactured by the same company that had manufactured the bullets that were shot through the boys' heads. Like the bullets at the crime scene, they were also hollow points. Also found was one of the boy's blue jeans, which were being worn by Taylor's brother-in-law, who testified that Taylor had recently given them to him. Those blue jeans had orange stitching on them, and the parents of one of the boys testified that they belonged to their son.

The police also searched the house of Taylor's girlfriend, Sherry Van Dyke, where they found a jacket that belonged to one of the boys. Ms. Van Dyke testified that Taylor had given her the jacket.

From this evidence no reasonable jury could have acquitted Taylor of murdering the two Trinity High School students even if Wade's statement were kept from its consideration. Wade's initial statement incriminating Taylor, though persuasive by

itself, was little more than cumulative of other evidence. This is especially true in light of the probability that the prosecution would offer this statement into evidence to rebut Wade's recantation. However, with or without the statement, the proof that Taylor kidnapped, sodomized, and murdered the two boys was overwhelming and no jury could fail to find guilt beyond a reasonable doubt.

### III. The juror's responses at *voir dire*

█ The second part of Taylor's CR 60.02 motion for a new trial was that a juror answered falsely when questioned during *voir dire* as to whether she could consider the full range of penalties for one convicted of murder. Specifically, Taylor argues that one particular juror failed to disclose religious beliefs that impaired her ability to consider a penalty other than death. During the post-conviction hearing, the juror in question said that "God's word does say that the death penalty is appropriate for murderers." It is Taylor's contention that because this information about the juror's belief in the death penalty was not shared with the defense when asked if she had any philosophical, religious or moral beliefs concerning the death penalty, his defense team could not use this information to move to strike her for cause or to use his peremptory challenges against her. It follows, he argues, that he is entitled to a new trial.

██ While Taylor is correct that the lower court misinterpreted RCr 10.04, he fails to show that a new trial is appropriate due to the juror's answers during *voir dire*. RCr 10.04 states that "[a] juror cannot be examined to establish a ground

for a new trial, except to establish that the verdict was made by lot." However, we have not interpreted this rule as the clear-cut exclusionary rule that its text appears to suggest. Indeed, we could not read it in such a way because the rule must give way to various constitutional requirements, such as due process of law. Our predecessor court noted as much in *Ne Camp v. Commonwealth* when it refused to allow the rigidity of the rule to stifle reversal where "[t]he misconduct [was] obvious." [11] And later this Court, in an opinion that cited RCr 10.04, noted that a defendant is free to establish that a juror did not truthfully answer on *voir dire*, but that it could not be established upon evidence of anything that occurred in the jury room. [12] So Taylor is correct that he may challenge the juror's answers at *voir dire* with her testimony given during the post-conviction hearing. But he must still meet the burden of proving those answers merit a new trial.

As this Court has recently stated, to merit a reversal because of the juror's allegedly improper responses (or lack of a response), a defendant "must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." [13] When applying this test to the facts, it is clear that Taylor does not merit a new trial.

█ Essentially there are three elements a defendant must show to deserve a new trial because of juror mendacity during *voir dire*. First, a material question must have been asked. Second, the juror must have answered the question dishon-

---

**11.** 311 Ky. 676, 680, 225 S.W.2d 109, 112 (1949).

**12.** *Hicks v. Commonwealth*, 670 S.W.2d 837, 839 (Ky.1984).

**13.** *Adkins v. Commonwealth*, 96 S.W.3d 779, 796 (Ky.2003) citing *McDonough Power Equip. Co. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984).

estly. And finally, the truthful answer to the material question would have subjected the juror to being stricken for cause. Here, there was a material question asked to the juror. A question about whether a potential juror believes she can consider the full range of penalties upon a conviction for murder is about as material as they come. However, Taylor fails to show that the juror answered the question dishonestly or that she should have been stricken for cause. During *voir dire* the juror was directly asked by the judge about her beliefs about capital punishment:

> Judge: Do you have any belief, religious, philosophical or moral, regarding capital punishment, either for or against?
>
> Juror: Do I need to answer that with a yes or no?
>
> Judge: Any way you wish to.
>
> Juror: I feel that there are circumstances where it is a justified reason for capital punishment but I think the evidence would have to weigh this before I made a decision.
>
> Judge: Would it be fair that in your mind you have no fixed position, that you are neither opposed for moral or religious or whatever reasons or for either way?
>
> Juror: No.
>
> Judge: That your mind is open on that issue?
>
> Juror: Yes sir.

And she was also questioned by the defense counsel.

> Counsel: I don't want to try and lead you or anything but what I would like for you to do if possible is just tell me how you feel about the death penalty in general. What would be your viewpoint on it?
>
> Juror: I think that there are situations where the death penalty is justifiable

and I think there again, it goes back to the situation and the evidence presented that would justify whether or not a person's life should be taken.

> Counsel: Do you feel that everybody convicted of murder should get the death penalty?
>
> Juror: Not necessarily.
>
> Counsel: You have heard about aggravating factors, such as robbery or something like that. Do you feel that people who are convicted of murder plus an aggravating factor should automatically get the death penalty?
>
> Juror: No, sir, I don't think so.

Taylor acknowledges these statements by the juror, but argues that she did not say the complete truth, and that if she had she would have been stricken for cause. We disagree. The statement the juror made at the post-conviction hearing that Taylor bases his argument on is that "God's word does say that the death penalty is appropriate for murderers." But this was already stated, albeit in a different way, as a response to both the judge and defense counsel. Taken in context, the juror's responses indicate that she was willing to take the evidence as it was presented and to reach a conclusion consistent with what the facts would allow. There is no reversible error in that. We hold that the juror answered honestly, and that the trial judge was correct in denying Taylor's CR 60.02 motion for a new trial based on her answers during *voir dire*.

## IV. The statute

■ Finally, Taylor challenges KRS 422.285 as unconstitutional because it encroaches upon powers assigned to the judiciary. Specifically, he claims that this statute contravenes the separation of powers provisions located in Sections 27 and 28 of the Kentucky Constitution. It is

important to note that Taylor did not move the trial court to grant deoxyribonucleic acid (DNA) testing as provided for in the statute. Instead, he sought a declaratory judgment that the statute was unconstitutional.

Kentucky enacted KRS 422.285 in 2002 to allow a person convicted of and sentenced to death for a capital offense to request DNA testing of any evidence in the possession of the Commonwealth, provided that certain preliminary issues are resolved, e.g., condition of the evidence. There are also notice provisions contained in the statute that require a petitioner to inform the Commonwealth of the testing and grant it access to the laboratory reports.[14]

KRS 422.285 was part of a wave of similar statutes in other states passed in response to a number of death-row inmates who were released from custody as a result of being exonerated by DNA testing nationwide.[15] DNA is the "genetic material present in the nucleus of cells in all living organisms,"[16] and it stores each individual's inherited traits. Though there are a number of processes by which DNA may be tested, all have essentially four basic steps. First, samples from a known and unknown source are isolated. Second, testing is conducted on each sample. Third, the DNA type is determined by analyzing particular regions of each sample's DNA. Finally, the results are compared between samples to verify whether the samples originated from a common source. After the testing process one of three results will be reached: that the samples originate from a common donor, that the samples do not originate from a common donor, or that the test is inconclusive.[17]

As noted above, Taylor challenges this statute because he feels it unconstitutionally infringes upon the judiciary's right to set court procedures in violation of the separation of powers provisions of Kentucky's Constitution. For support, he cites Foster v. Overstreet[18] and Commonwealth v. Reneer,[19] stating that each case is "directly on point." In both of those cases we held that the statute in question was unconstitutional as an encroachment on the rule-making prerogative of the judiciary. In holding the statute in Reneer unconstitutional we noted that the statute was procedural in nature, neither adding nor removing elements necessary to convict or alter the penalty for a conviction.[20] Such a procedural enactment invaded this Court's authority to prescribe rules pursuant to section 116 of our Constitution,[21] and, as such, violated the separation of powers provision enunciated in Section 28 of the Kentucky Constitution.[22]

14. KRS 422.285.

15. *See generally* Heidi C. Schmitt, *Post–Conviction Remedies Involving the Use of DNA Evidence to Exonerate Wrongfully Convicted Prisoners: Various Approaches Under Federal and State Law,* 70 UMKC L.Rev. 1001 (2002).

16. Nat'l Comm'n on the Future of DNA Evidence, U.S. Dep't of Justice, Pub. No. 177626, Post-conviction DNA Testing: Recommendations for Handling Requests 21 (1999).

17. *Supra* n. 14.

18. 905 S.W.2d 504 (Ky.1995).

19. 734 S.W.2d 794 (Ky.1987).

20. *Id.* at 796.

21. Section 116 of the Kentucky Constitution states that "[t]he Supreme Court shall have the power to prescribe ... rules of practice and procedure for the Court of Justice."

22. Section 28 of the Kentucky Constitution states that "[n]o person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

■ Likewise, the statute that Taylor challenges is a procedural enactment, which in no way modifies any elements necessary to convict or penalties to be imposed upon conviction. Therefore, we hold that KRS 422.285 infringes a constitutional power properly belonging to the Supreme Court. Nevertheless, not all statutes that unconstitutionally infringe upon the rule-making power of the Supreme Court have been struck down entirely. We retain the right to enforce such statutes by way of comity. In fact, the statutes in the two cases cited by Taylor as being "directly on point" were enforced by the Court by way of comity.[23]

■ Principles of comity enjoy a strong history in our Commonwealth and in this nation, and remain a sound rule of law.[24] In *O'Bryan v. Hedgespeth* we expressed it thusly: "Comity, by definition, means the judicial adoption of a rule unconstitutionally enacted by the legislature not as a matter of obligation but out of deference and respect."[25] But we do not go about deciding whether to grant comity to an otherwise inappropriate statute without cognizable standards. In order for a statute to be extended comity this Court must find that such a statute is a "statutorily acceptable substitute for current judicially mandated procedures"[26] or can be "tolerated in a spirit of comity" because it does not unreasonably interfere with the "orderly functioning of the courts."[27] It is clear that KRS 422.285 meets the latter standard we use to determine whether comity should be extended. In fact, under prevailing law, without the statutory privileges in KRS 422.285 a defendant who has been convicted of a capital crime and sentenced to death would not have an opportunity to request DNA testing of existing evidence. A statute allowing a death-row inmate to obtain DNA testing furthers the interest of justice by better ensuring that the Commonwealth does not follow through with putting an innocent man to death. In the words of our precedent, such a statute furthers the "orderly functioning of the courts" and is a "statutorily acceptable substitute for current judicially mandated procedures." Therefore, we uphold, under principles of comity, KRS 422.285 until superseded or modified by this Court.[28]

Accordingly, we affirm the trial court's decision to deny Taylor's CR 60.02 motion for a new trial based on the recanted testimony of Wade. We also affirm the trial court's denial of Taylor's CR 60.02 motion for a new trial based upon his belief that a juror was dishonest in answering questions during *voir dire*. Finally, we hold that KRS 422.285 is an unconstitutional encroachment of the Court's rule-making prerogatives. However, we extend comity to that statute.

23. In *Commonwealth v. Reneer* we stated that although the truth in sentencing statute violates constitutional separation-of-powers provision, it would not be held unconstitutional and would be accepted for time being under principle of comity. 734 S.W.2d at 797. In *Foster v. Overstreet* we held a statute providing review of trial judge's impartiality by Chief Justice unconstitutional, but nevertheless upheld its provisions under principles of comity. 905 S.W.2d at 506.

24. See *Key v. Commonwealth*, 6 Ky. (3 Bibb) 495 (1814) (discussing "comity among nations") and *Williams v. Jones*, 77 Ky. (14 Bush) 418 (1878) (dealing with comity between states).

25. 892 S.W.2d 571, 577 (1995) (citing BLACK's LAW DICTIONARY 242 (5th ed.1979)).

26. *Drumm v. Commonwealth*, 783 S.W.2d 380, 382 (Ky.1990).

27. *Reneer*, 734 S.W.2d at 797.

28. *E.g.*, *O'Bryan v. Commonwealth*, 634 S.W.2d 153, 158 (Ky.1982).

GRAVES, SCOTT, and WINTERSHEIMER, JJ., concur.

COOPER, J., files a separate opinion concurring in part and dissenting in part in which JOHNSTONE, J., joins.

KELLER, J., dissents by separate opinion.

COOPER, Justice, concurring in part and dissenting in part.

I concur in the majority's analysis of the only issues presented to us by this CR 60.02 motion, *i.e.,* whether Appellant should be granted relief from the final judgment on the basis of newly discovered evidence. I dissent, however, from the majority's gratuitous suggestion that the admission at trial of George Wade's "confession" in which he claimed Appellant was the sodomizer and triggerman in these gruesome crimes could be "cumulative evidence" or "harmless error."

In *Taylor v. Commonwealth,* 821 S.W.2d 72 (Ky.1990) (*"Taylor I"*), we upheld the admission of Wade's statement under the common-law hearsay exception for statements against penal interest because the statement also inculpated Wade as an accomplice, *i.e.,* it was, in fact, a statement against Wade's penal interest. *Id.* at 75. *See* KRE 804(b)(3). When the issue was raised again on appeal from the denial of Appellant's RCr 11.42 collateral attack, *Taylor v. Commonwealth,* 63 S.W.3d 151, 166–68 (Ky.2001) (*"Taylor II"*), the United States Supreme Court had decided *Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), in which a plurality of the Court held that Rule 804(b)(3) was not an available vehicle for admission of an out-of-court statement by a nontestifying codefendant that inculpated the defendant. However, we again upheld the admission of Wade's statement because the relevant holding in *Lilly,* as a plurality decision, was not binding precedent, and because

Wade's statement also possessed "adequate indicia of reliability" demonstrated by "particularized guarantees of trustworthiness," so that its admission was authorized by *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). *Taylor II,* 63 S.W.3d at 166–67.

Subsequent to our decision in *Taylor II,* the United States Supreme Court decided *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which not only reaffirmed the plurality opinion in *Lilly, id.* at 55, 124 S.Ct. at 1367 ("[A]ccomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule.") (quoting *Lilly,* 527 U.S. at 134, 119 S.Ct. at 1899), this time in the context of a majority opinion, but also overruled *Roberts, id.* at 69, 124 S.Ct. at 1374, thus removing any remaining underpinning for the admission of such evidence in *Taylor.* In fact, the Court specifically identified *Taylor II* as an example of the type of error fostered by *Roberts. Id.* at 64, 124 S.Ct. at 1371.

We recently recognized the effect of *Crawford* on our *Taylor* decisions in *Terry v. Commonwealth,* 153 S.W.3d 794, 799–800 (Ky.2005). Presumably, that is why the majority of this Court feels compelled to attempt to defend our *Taylor* decisions on the "newly discovered" basis of "cumulative evidence" and "harmless error." These issues were not raised in *Taylor I* or *Taylor II* and are not raised now. We need not defend our previous *Taylor* decisions. Both were supported by what appeared to be sound legal principles extant at the time they were decided. The United States Supreme Court subsequently decided otherwise—which is its prerogative when construing the Confrontation Clause of the Sixth Amendment of the United States Constitution. There is no good reason for us to *sua sponte* attempt to justify our prior decisions by conjuring and decid-

ing new issues that are not before us. However, there is a very good reason not to do so. The position of a Court of Justice is that of neutral arbiter, not advocate. Our job is to apply sound legal principles to the facts and issues before us—not to advocate to the federal courts how they should decide an issue that is no longer before us.

Even if that were not so, Wade's statement inculpating Appellant as the sodomizer and triggerman in this case was either admissible or not, and that decision will ultimately be decided by the federal courts on habeas corpus review. However, the admission of Wade's statement was neither cumulative nor harmless. The only two people who know who actually committed the sodomy and murders are Appellant and Wade. In his statement to the police, Wade admitted to his participation in the kidnappings and thefts but claimed that he left the scene before Appellant committed the sodomy and murders, and that he heard the gunshots as he was leaving the scene. Appellant exercised his Fifth Amendment right not to testify in his own behalf. Thus, the only evidence of who was the actual sodomizer and triggerman was contained in Wade's self-serving, out-of-court statement that cast the blame on Appellant.

"The relevant inquiry under the harmless error doctrine 'is whether there is a reasonable possibility that the evidence complained of *might have contributed to the conviction.'* " *Jarvis v. Commonwealth*, 960 S.W.2d 466, 471 (Ky.1998) (emphasis added) (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)). This same "harmless error" standard was reaffirmed as the basis for evaluating constitutional errors (such as this claimed Confrontation Clause violation) in *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17

L.Ed.2d 705 (1967). "An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy*, be conceived of as harmless." *Id.* at 23–24, 87 S.Ct. at 828. Obviously, Wade's out-of-court statement was neither cumulative nor harmless.

But we should not address this issue at all. Appellant filed his CR 60.02 motion seeking relief on the basis of newly discovered evidence and that is the only issue before us. Even though *Crawford* was decided prior to the filing of Appellant's brief to this Court (and is cited on page 1 thereof), Appellant has not asked this Court to grant him relief from the judgment on the basis of "change of law." Nor has the Commonwealth asked us to reaffirm the judgment on the basis of "cumulative evidence" or "harmless error."

"Intervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under Rule 60(b)(6) [federal equivalent of CR 60.02(f) ]. . . ." *Agostini v. Felton*, 521 U.S. 203, 239, 117 S.Ct. 1997, 2018, 138 L.Ed.2d 391 (1997). That is true even when the intervening change results from a decision of the United States Supreme Court that is directly on point. Consider:

In the previous appeal in this qui tam action under the False Claims Act (FCA), *Garibaldi I* [*United States ex rel. Garibaldi v. Orleans Parish School Bd.*, 244 F.3d 486 (5th Cir.2005) ], we vacated the plaintiffs' judgment on the verdict, and rendered judgment for the Orleans Parish School Board holding that the board was not a "person" subject to liability under the FCA. This court's judgment in that case became final when the Supreme Court denied certiorari. Subsequently, the Supreme Court, in *Cook County v. United States ex rel Chandler*, [538 U.S. 119, 123 S.Ct.

1239, 155 L.Ed.2d 247 (2003)] held that local governments are "persons" amenable to qui tam actions under the FCA. Following the Supreme Court's decision in *Chandler*, the plaintiffs filed a motion in the district court for relief under Rule 60(b)(6) from this court's final judgment in *Garibaldi I*. The district court concluded that *Chandler* had overruled *Garibaldi I*, granted plaintiffs' motion, and re-entered its judgment on the verdict for the plaintiffs against the school board. The school board appealed. We reverse. In the absence of "extraordinary circumstances," a change in controlling decisional law after the finality of a judgment does not warrant reopening the judgment under Rule 60(b)(6). The circumstances here are not "extraordinary" because this case in [sic] not materially distinguishable from the "ordinary" case in which a subsequent change in controlling law is not held to justify relief from a prior final judgment under Rule 60(b)(6).

*United States ex rel. Garibaldi v. Orleans Parish Sch. Bd.*, 397 F.3d 334, 335–36 (5th Cir.2005) (internal footnotes omitted). *See also Morris v. Horn*, 187 F.3d 333, 341–42 (3rd Cir.1999). Admittedly, there are cases holding that a particular change in the law created an "exceptional circumstance" warranting Rule 60(b)(6) review. *E.g., Marrero Pichardo v. Ashcroft*, 374 F.3d 46, 56 (2nd Cir.2004) (change in deportation law). However, it is inappropriate for us to address whether *Crawford* requires a different result in this case when Appellant has not claimed that it does.

JOHNSTONE, J., joins this opinion.

KELLER, Justice, dissenting.

I respectfully dissent, primarily for the reasons expressed in my dissent in Taylor's second appeal of his conviction and death sentence.[1] Though I do not wish to engage in an extended analysis again, I must point out that the trial court committed an error of constitutional magnitude when it allowed George Wade's statement to be introduced into evidence. The Supreme Court of the United States recognized this error when it overruled *Ohio v. Roberts*[2] and cited our opinion in Taylor's second appeal as an example of "[t]he unpardonable vice of ... *Roberts* ... [i.e.,] its demonstrated capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude."[3] We also recognized this error when we noted that *Crawford* "remov[ed] any remaining underpinning for the admission of such evidence in *Taylor*."[4]

Given the magnitude of Wade's testimony, which was the only evidence that identified Taylor as the shooter in these murders, it is inconceivable that we could label its introduction as harmless error. By refusing to reverse Taylor's conviction a *third* time, however, we are simply allowing this blatant error to stand, perhaps in the hope that the federal courts will address the issue. While I have no doubt that they will, and that they should, we do

1. *See Taylor v. Commonwealth*, 63 S.W.3d 151, 168 (Ky.2001) (Keller, J., dissenting).

2. 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

3. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *see also Terry v. Commonwealth*, 153 S.W.3d 794, 800 (Ky.2005) ("The [United States Supreme] Court specifically identified *Taylor II* as an example of the type of error attributable to *Roberts*.").

4. *Terry*, 153 S.W.3d at 800; *Bowling v. Commonwealth*, 168 S.W.3d 2 (Ky.2004) (recognizing that *Crawford* abrogated our decision in *Taylor v. Commonwealth*, 63 S.W.3d 151 (Ky.2001) as to this issue).

not need to wait for the federal courts to provide maid service to clean up the mess created by our flawed evidentiary ruling, especially when this case is already over fifteen years stale. We perform an additional disservice to both the Commonwealth and Appellant by adding further to the staleness and possible loss of the evidence when we once again ignore the law and fail to reverse and remand for a new trial at this time.